Roslyn M. GRILL and Bernard B. Grill, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Richard G. HEALY and Marianne Healy, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Nos. 79 C 990, 79 C 3296.

United States District Court, E.D. New York.

Aug. 25, 1982.

Paul D. Rheingold, New York City, for plaintiffs.

Raymond J. Dearie, U.S. Atty., E.D.N.Y. by Jan F. Constantine, Robert L. Begleiter, Patrick Northup, Asst. U.S. Attys., Brooklyn, N.Y., for defendant.

GEORGE C. PRATT,* Circuit Judge.

Plaintiffs brought these actions to recover for injuries claimed to have been caused

* Of the United States Court of Appeals for the      Second Circuit, sitting by designation.

by a swine flu vaccine administered to plaintiff Roslyn Grill and to plaintiff Richard Healy as part of the national swine flu immunization program. Jurisdiction is not disputed. 28 U.S.C. § 1346(b) and 42 U.S.C. § 247b.

After remand from the multidistrict litigation phase of these cases, and after local discovery, the parties agreed that the issue of causation should be tried separately and first. Because both plaintiffs claim to have contracted optic neuritis as a result of the vaccine and, because both plaintiffs are represented by the same attorney, the parties agreed to a joint trial of the causation issues. To that end evidence was presented to the court sitting without a jury in May, 1982. Each of the plaintiffs testified; treating doctors and expert witnesses also testified in person and by deposition. In addition, both parties rely on excerpts from deposition testimony taken during MDL discovery.

The court has considered carefully the live testimony, the deposition testimony, the exhibits submitted and the arguments of counsel. This memorandum constitutes the court's decision in both cases, and includes the court's findings and conclusions pursuant to FRCP 52(a).

It is undisputed that both plaintiffs developed severe eye problems within a month after receiving a swine flu shot. Plaintiffs claim the condition was optic neuritis, an inflammation of the optic nerve, which runs back from the retina of the eye into the brain. Optic neuritis has many known causes and associations, including certain drugs and chemicals such as lead and carbon tetrachloride, viral problems, an autoimmune process, and toxins. It is also associated with multiple sclerosis. Plaintiffs claim here that the swine flu vaccine caused a hypersensitive autoimmune reaction which resulted in demyelinization of the optic nerve. Plaintiffs argue that the onset of eye problems soon after the administration of the vaccine, coupled with the symptoms exhibited and the medical opinions in evidence, satisfy their burden of proving causation.

Defendant contends that the only probative evidence here is temporal, that the incidence of optic neuritis in vaccine recipients was no greater than its incidence in the general population, that there are many other possible causes of optic neuritis, and that the causes in these cases were vascular problems for Mr. Healy and a slow growing tumor on the optic nerve of Mrs. Grill.

### Plaintiff Grill

Mrs. Grill received her swine flu vaccine on October 15, 1976 when she was 50 years of age. She had experienced no prior eye trouble, except she did use glasses for reading. Immediately after the shot, she suffered the normal post-vaccinal sensations of burning and swelling of the left arm, followed by flu-like symptoms of a mild temperature, chills and aching lungs. She testified that she also felt a slight pain during this period, in her left eyeball. Suddenly, on November 6, 1976, she could not see out of her left eye. The following Monday she went to Dr. Abraham D. Winter and told him that she had experienced pain in her left eye, and that she could not see out of her left eye, but had no vision problems in her right eye.

She visited a number of other doctors and was placed on cortisone therapy, on which she has become dependent. If the amount of cortisone is decreased, her vision deteriorates and pain recurs. When a heavier cortisone dosage is restored, the pain disappears and the vision returns to a level where she can see forms, but not details and features.

Dr. Winter's initial diagnosis was that Mrs. Grill had iridocyclitis, which is an allergic condition, in this case causing an inflammation of the iris and ciliary body. Her loss of color vision in the left eye indicated to him a possible involvement of the optic nerve, because color vision fibers are very sensitive to inflammatory changes of that nerve.

In late December of 1976, Dr. Winter diagnosed Mrs. Grill's worsened condition as an active optic neuritis. She was experi-

encing severe pain and could count fingers only up to six feet away. While he was not sure, Dr. Winter suspected the swine flu vaccine as a cause, because he had read in the literature that optic neuritis is a condition which sometimes follows vaccinations. His treatment of Mrs. Grill was as if she had an inflammatory condition; he gave her cortisone, varying the amount to determine the smallest amount that would keep her comfortable and keep her vision level tolerable. He found that if he reduced the dosage, her pain increased and the quality of her vision deteriorated.

Dr. Winter interpreted a CAT (computed axial tomography) scan of Mrs. Grill's optic nerve and felt strongly that the enlargement on the optic nerve was not a tumor, primarily because he felt that a tumor could not respond so dramatically to cortisone, which is a drug that reduces inflammatory reactions. A second CAT scan showed, in his opinion, no enlargement of the elongated tortuous optic nerve.

Dr. Winter's conclusion was that Mrs. Grill had suffered an allergic reaction to the swine flu vaccine and that the effects were continuing to date. Her problems followed reasonably soon after receiving the vaccine; and he could find no other etiology for her symptoms, although he conceded that her case differs from any other optic neuritis he has seen. In his opinion the CAT scans did not show a tumor. Her response to cortisone treatment was indicative that she suffers from an inflammatory condition, not a tumor.

On cross-examination Dr. Winter conceded that he had had no prior experience with eye problems caused by the swine flu vaccine. Dr. Winter conceded that a tumor was a possibility in one of the CAT scans, but he contended that if the cause of her eye trouble were a tumor, the beneficial effect of cortisone would have been limited to only a few weeks, and would not have continued for years. Dr. Winter conceded that over half of the cases of optic neuritis have no known etiology and that an ordinary virus may cause the condition.

Dr. Miles Michael Behrens' deposition was presented to the court. He had treated Mrs. Grill beginning in January 1977. In his opinion, the flu vaccine was related as one possible alternative cause of Mrs. Grill's condition. To him, however, her clear response to steroid therapy indicated something other than ordinary optic demyelinating neuritis, which to him raised "the possibility of an orbital inflammatory pseudo-tumor syndrome", although there was not enough likelihood of a pseudo-tumor in his mind to have mentioned it in his report.

Dr. Behrens saw Mrs. Grill again in May 1977. At that time he adjusted her steroid medication, and he became more concerned about the possibility of a tumor of the optic nerve, particularly in view of the steroid responsivity without on-going inflammatory signs. Based on the CAT scan done at that time, his view was that the likelihood of a tumor was remote. Mrs. Grill's then symptoms were consistent with a tumor, but the initial findings of an inflammation in the eye and weakness of the eye were not compatible with a tumor, nor would pain or movement of the eye be compatible, except rarely.

Dr. Behrens saw Mrs. Grill again in July of 1977. He again adjusted her cortisone dosage. By that time Mrs. Grill had significantly improved. She had no residual limitation of movement, but she did have minor residual optic nerve damage. In the final analysis, Dr. Behrens did not have an opinion as to the etiology of Mrs. Grill's condition.

Dr. Edwin H. Eylar expressed the opinion that the likelihood that Mrs. Grill's optic neuritis was caused by the swine flu vaccine exceeds 90%. He based that opinion on the time between injection and onset of symptoms, on tests on animals with $P_2$ protein, a component of nerve myelin, on the susceptibility of the optic nerve to immune mediated disease, and on a differential diagnosis which ruled out other possible causes.

Dr. Eylar is a PhD, not an MD. He conceded that the $P_2$ protein was an essential component in the central nervous system of animals, but had not yet been identi-

fied in humans. The animal tests he referred to involved a more concentrated injection than the greatest amount of $P_2$ protein found in the swine flu vaccines.

To counter Dr. Eylar's testimony the government presented the testimony of Steven Warren Brostoff, a PhD who specializes in neurochemistry and neuroimmunology. Specifically, he supervised tests for $P_2$ protein and myelin basic protein in various lots of the swine flu vaccine, including those from which the shots given to Mrs. Grill and Mr. Healy were taken. Although the sensitivity of the tests would detect levels of $P_2$ and myelin basic protein at one nanogram (one one-billionth of a gram) per milliliter of the substance tested, no myelin basic or $P_2$ protein was found in either lot. The court finds Dr. Brostoff's testimony persuasive and concludes that contrary to Dr. Eylar's theory there was no myelin basic or $P_2$ protein in the vaccines which are the subject of this case.

Three CAT scans were performed on Mrs. Grill, on May 20, 1977, July 29, 1977, and February 5, 1981. The doctor reporting on the first CAT scan commented that the optic nerve on the left appeared somewhat thickened as compared to the right, and noted "a localized bulge in the outline of the optic nerve". That suggested to him the possibility of a small mass lesion along the sheath of the optic nerve, although he found no abnormal enhancement. He also raised the possibility of a granulomatosis process or fibrosis following inflammatory changes. The doctor reporting on the May 1977 CAT scan noted a "thick elongated torturous [sic] optic nerve on the left compatible with optic neuritis." After litigation was begun, a third CAT scan was performed in February 1981 by Dr. Mark Kashen who noted that it revealed a "normal orbital examination".

Dr. Kashen testified that while the first CAT scan showed a left optic nerve that was one millimeter thicker than the right, he felt that the difference was within normal range. The bulge that appears in the second CAT scan in the left optic nerve in his opinion reflected the undulating course of the nerve, and not a tumor.

Dr. Kashen's final evaluation was that the left optic nerve was slightly larger than the right, but was progressing toward normal. He felt that the condition shown in the x-rays was consistent with neuritis of the optic nerve, and that there was no evidence of a tumor such as a bulging of the left eyeball, or a complete loss of vision. On cross-examination, Dr. Kashen acknowledged that another expert might read Mrs. Grill's x-ray pictures as showing a mass on the optic nerve.

Dr. Henry D. Perry testified that in his opinion the swine flu vaccination caused an optic neuritis condition in Mrs. Grill. He based his opinion on the timing of the onset of her symptoms, the presence of inflammation in the front of the eye, the weakness in the left lateral rectus muscle, the fact that the condition has lasted for over four and one half years and is steroid dependent, and the absence of any tumor in the February 1981 CAT scan. Dr. Perry eliminated as possible causes of Mrs. Grill's condition, tumor of the optic nerve, multiple sclerosis, diabetes, glaucoma, vascular or atheral sclerotic disease, viral infection and pseudotumor.

In his opinion, Mrs. Grill suffered from an inflammation of the optic nerve resulting from an autoimmune reaction. Some of such reactions, such as Guillain Barre's syndrome (GBS), have been provoked by vaccines. He found no reason why the underlying mechanisms for Mrs. Grill's condition should be different from those in GBS. He found it not surprising that only one eye was affected, because frequently optic neuritis is unilateral. In his opinion, tumor was not the cause of Mrs. Grill's condition.

Defendant called Dr. Michael S. Tenner to interpret Mrs. Grill's CAT scans and other evidence. In his opinion the likelihood of the small enlargement of the left optic nerve as shown on the CAT scans was still well within the realm of possibility of being a tumor. In his opinion it was unlikely that plaintiff had an inflammatory lesion, and he leaned much more heavily toward hers being a neoplastic lesion.

Defendant's other expert, Dr. Arthur H. Wolintz, is a neurologist and opthalmologist who specializes in neuro-opthalmology. In his opinion Mrs. Grill is suffering not from optic neuritis, but from left optic neuropathy, most probably caused by a space-occupying lesion. Optic neuropathy refers to a disorder of optic nerve function which may be secondary to a mass, an inflammation or an occlusion of a blood vessel. In Dr. Tenner's opinion Mrs. Grill does not have an optic neuritis because she did not show an inflammatory lesion of the optic nerve. Dr. Wolintz had suspected a mass and requested further analysis of her CAT scans. In his view, Dr. Tenner's interpretation of the CAT scans indicated a slow growing mass which had not changed significantly in the three and one half years from May of 1977. Such a mass, according to him, has never been associated with influenza vaccine.

Dr. Wolintz also ruled out an optic neuritis because an optic neuropathy caused by a mass is more consistent with Mrs. Grill's history, clinical findings and radiologic reports. Her steroid dependency, with "exquisite sensitivity" to the level of steroids administered, is inconsistent with a neuritis which usually shows improvement in vision and function of the optic nerves either with or without steroid therapy. Thus, her continued sensitivity to steroid therapy makes optic neuritis an unlikely possibility. The iridocyclitis and impairment of function of the left lateral rectus muscle, with which Mrs. Grill's condition began, are not usually seen in an optic neuritis. While an autoimmune optic neuritis may present itself either unilaterally or bilaterally, usually it evolves into a bilateral process within several weeks. Mrs. Grill's symptoms, however, have remained unilateral for five years.

Dr. Wolintz further testified that although several clinical reports have reported optic neuritis following an influenza vaccine, there has not yet been medical proof of any causal connection. Out of approximately 46,000,000 swine flu vaccinations there have been only eight reports of optic neuritis with an onset in temporal proximity to the vaccination. In Dr. Wolintz' opinion, if the swine flu vaccine were capable of

inducing optic neuritis or an optic neuropathy, he would have expected many more reported cases. Dr. Wolintz' finding of tumor rested on Dr. Tenner's opinion; he had not seen Dr. Kashen's report, nor had he examined the CAT scan pictures themselves. In Dr. Wolintz' opinion it was more probable that the cause of Mrs. Grill's condition is unidentifiable than that it was a swine flu shot. Her progress is not consistent with an autoimmune demyelinization process which usually stops within a year or two, but Mrs. Grill's condition is still responsive to steroids. According to Dr. Wolintz, it is very rare to have an autoimmune response as localized as Mrs. Grill's condition. Usually such a response is more generalized.

Dr. Bennett Derby testified on behalf of defendant and disagreed with Dr. Perry's opinion that Mrs. Grill's eye problem was caused by an autoimmune process triggered by the swine flu vaccination. Dr. Derby gave several reasons to support his opinion. (1) If Mrs. Grill began suffering eye problems as soon as two days after the innoculation, as she testified, this was much too soon to have resulted from an immune reaction. (2) The protracted course of Mrs. Grill's symptoms over more than five years is never seen in immune mediated optic neuritis. (3) The course of Mrs. Grill's condition is not consistent with a demyelinating autoimmune disorder; it is more consistent with a space-occupying lesion. Such a benign lesion would explain the continued inflammation of the nerve, the protracted course of her condition, and her dependence upon and sensitivity to steroids to maintain her sight.

According to Dr. Derby, two studies of the incidence of optic neuritis in Scandanavia and Israel indicate an incidence of .94 per 100,000 population and .56 per 100,000 population, respectively. Even at the lower figure, if applied to the 46,000,000 who received the swine flu vaccine, one would expect approximately 70 optic neuritis cases without any additional causal factor. The number of reported complaints of optic neuritis among swine flu vaccinees is much

lower. Dr. Derby concludes that the temporal relation does not establish a causal relation.

■ Evaluating the evidence presented, the court finds and concludes that plaintiff Grill has failed to meet her burden of proving that the swine flu vaccination she received is a cause of the eye condition from which she has suffered for the last five years. At most, she has established a possibility of such a causal connection; she has not met her burden of establishing causation by a fair preponderance of the credible evidence. The strongest factor in her favor is, of course, the temporal connection between the vaccine and the onset of symptoms. By itself, however, this is not sufficient to prove causation, because the incidence of optic neuritis or optic neuropathy in the general population is at least as large as that found in vaccine recipients during the immediate post-vaccination period. Unlike GBS, therefore, no increased incidence of optic neuritis problems following the swine flu vaccines has been demonstrated.

There are other weaknesses in plaintiff Grill's case. If she suffered from an autoimmune reaction, her difficulties would have subsided long before this. Instead, the continuation of her pain and her loss of vision together with their sensitivity to steroid treatment reveal a continuing, active, irritating agent operating on the optic nerve. As between the theory of an autoimmune reaction offered by plaintiff's experts and the theory of a space occupying lesion offered by defendant's experts, the court finds more persuasive and more credible the defendant's explanation for plaintiff Grill's difficulties. Plaintiff Grill having failed to establish a causal connection between the administration of the vaccine and the conditions complained of, her complaint must be dismissed.

### Plaintiff Healy

Mr. Healy, who is 44 years old, was a detective with the New York City police force from February 1965 to May of 1981, when he was terminated for blindness in his right eye. Prior to 1976 he had enjoyed good health, and normal vision with no eye problems. He received his swine flu vaccine on October 15, 1976. He experienced no reaction immediately, nor for the next few days. On about November 4, 1976, he experienced some pain for one or two minutes in his right eye whose vision then became blurred. His condition degenerated into blindness within a few days. Although initially he could not see out of his right eye, the condition has improved considerably so that he now can see around the periphery, although he cannot see in the middle of his vision field. He has visited a number of doctors, but has not been given any treatment.

Dr. George M. Howard, an ophthalmologist, had examined Mr. Healy for treatment in November 1976. In his deposition testimony he reported that visual acuity in the right eye was 20/100 and in the left eye 20/20. His examination consisted entirely of a physical examination of the eyes, plus x-rays of orbit and optic canals. His diagnosis was a retrobulbar neuritis in the right eye, which he explained was an inflammation of the optic nerve behind the eye, a condition that usually affects only one eye. Among its possible causes are medication, virus infection, multiple sclerosis and other neurological abnormalities.

Dr. Howard approximated that 20 to 25% of the cases of retrobulbar optic neuritis have no known cause. In his report he mentioned that the swine flu vaccination was a possible cause of Mr. Healy's optic neuritis; however, he explained that he was stating that not to a reasonable degree of medical certainty, but only as a probability in the absence of any other indicated cause. His mental association between vaccination and optic neuritis came from his recollection of a textbook, *Clinical Ophthalmology,* by Walsh, which had reported that vaccinations may have been one of the contributing causes of optic neuritis. On his examination he did not see any evidence of occluded veins, nor did he find any definite lesion that would explain the optic neuritis.

Dr. Henry D. Perry examined Mr. Healy approximately two years later, in Novem-

ber 1979. He also reviewed the records of Mr. Healy's prior examinations by other doctors. In Dr. Perry's opinion the most likely diagnosis was optic neuritis secondary to a swine flu vaccination. He found all other diagnoses to be "much less likely", basing his opinion upon several factors: the delay between vaccination and onset of symptoms, the association between vaccination and optic neuritis that is reported in the medical literature and has been proven in experimental laboratory studies, and an inability to find any other abnormalities. Dr. Perry postulated that the underlying mechanism in optic neuritis is similar to that seen in GBS, which results from an attack by the immune system upon the myelin sheath of the optic nerve. He found it "reasonable to conclude" that if the swine flu vaccine could cause GBS, it could cause other autoimmune diseases affecting nerve tissue.

On his cross-examination, Dr. Perry departed from the view expressed in his prepared direct testimony about Mr. Healy and expressed his opinion that the loss of vision was caused not by an autoimmune reaction attacking the myelin covering of the optic nerve, but instead, by an inflammation of the blood vessel serving the optic nerve which in turn caused an obstruction of blood flow to the optic nerve, which in turn caused death to a portion of the optic nerve.

The court found that Dr. Perry's shifting theories, coupled with his exaggerations and the loosely drawn inferences in his direct testimony rendered his opinion of little help in determining whether the swine flu vaccine caused Mr. Healy's eye problems.

Dr. Wolintz performed a neuro-ophthalmologic examination on Mr. Healy in June 1981. He also reviewed Mr. Healy's medical records. Dr. Wolintz noted that when Mr. Healy had been examined on November 5, 1976, immediately after he suffered his vision impairment, the examining doctor noted an edema of the right optic nervehead and made findings that were thought to be consistent with an occlusion of a branch of the retinal vein in the right eye. Four days later, an examining ophthalmolo-

gist noted an inferior nasal hemorrhage. Later, the edema resolved, but there was left a pallor of the inferior temporal aspect of the right optic nervehead, a pallor which still existed in 1981.

Dr. Wolintz' conclusion was that Mr. Healy suffered from right optic neuropathy of a "segmental" type. His segmental visual field loss indicated to him that a vascular cause would be the primary consideration. He reasoned that since the branches of the ophthalmologic artery are disposed in a segmental fashion, one can assume that if the visual field involvement is segmental, then one of the branches of the ophthalmic artery, called the posterior ciliary arteries, has been involved. A blockage of one of the approximately 20 branches of the ophthalmic artery causes a loss of only a segment of a person's field of vision.

Dr. Wolintz' conclusion was that Mr. Healy suffers from an occlusion of a vessel supplying blood to the optic nerve. Such an occlusion can be caused by a number of conditions, including diabetes mellitus, occlusive vascular disease secondary to hyperviscosity syndromes, atherosclerosis, elevated fats in the blood, primary disease of the blood cells causing an increased ability to clot, sarcoidosis, and even mass lesions.

Dr. Wolintz was unable to state what particular factor caused Mr. Healy's occlusion and resulting vision loss. In his view, "the majority of cases of optic neuropathy are idiopathic, without a known cause." He did say, however, that each of the seven causes indicated above are more probable than is the swine flu vaccine.

According to Dr. Wolintz, "It would be very improbable for a reaction to an influenza vaccine to present itself as a branch retinal vein occlusion or optic nerve problem in such a segmental fashion. Certainly, there is no documented evidence that such a thing has ever occurred." Had there been an inflammation of the vein, it would have caused more diffuse effects, because usually when an inflammatory process is the cause of occlusive disease of the retinal veins, more than one branch is involved. In relation to Mr. Healy, Dr. Wolintz repeated his

review of the clinical reports of optic neuritis following an influenza vaccine, as well as his review of the literature on the subject, as discussed earlier in this decision with respect to Mrs. Grill.

 After weighing and considering the evidence applicable to plaintiff Healy, the court finds and concludes that plaintiff Healy has failed to meet his burden of proving that the swine flue vaccination he received is a cause of the loss of vision in his right eye from which he has suffered since November of 1976. As with Mrs. Grill, Mr. Healy has established no more than a possibility of such a causal connection.

Dr. Howard's opinion, given at the time of onset and based on a single examination, no more than suggested the vaccine as a possible cause, and it is entitled to very little weight. Indeed, Dr. Howard does not seem to have recognized that the immediate cause of plaintiff's blindness was vascular, and he found no evidence of the occlusion in the blood vessels serving the optic nerve.

Dr. Perry's opinion is undercut by the shift in theory between his prepared direct examination and his cross-examination. Apparently, Dr. Perry was persuaded by other evidence in the case that the cause of Mr. Healy's difficulty was vascular, rather than a demyelinization of the optic nerve.

As with Mrs. Grill, the close temporal connection between Mrs. Healy's vaccine and the onset of his symptoms would seem to argue in favor of a causal connection. It is well settled, however, that while relevant, without more such a temporal connection is not sufficient to establish causation.

Finally, the attempt by plaintiff to liken his optic neuritis to a GBS problem fails, because there was no increased incidence of optic neuritis problems after the swine flu vaccine had been administered.

In short, the court finds more persuasive and more credible the testimony of defendant's experts who negate a causal connection between the vaccine and plaintiff Healy's problems in his right eye. Plaintiff Healy having failed to establish a causal connection between the administration of the vaccine and the conditions complained of, his complaint must be dismissed.

*Conclusion*

The clerk is directed to enter judgment in each case in favor of the defendant, dismissing the complaint.

SO ORDERED.