**Dale A. HUPP, and Carolyn Hupp, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. C–1–80–572.**

United States District Court, S.D. Ohio, .W.D.

Dec. 1, 1982.

Thomas R. Bopeley, Zanesville, Ohio, for plaintiffs.

Donetta D. Wiethe, Asst. U.S. Atty., Elizabeth Gere Whitaker, Joseph E. Kane, Asst. U.S. Attys., Cincinnati, Ohio, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SPIEGEL, District Judge:

This action is brought pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671 *et seq.* and the National Swine Flu Immunization Act, 42 U.S.C. § 247b. The suit was filed on April 27, 1979. On June 18, 1979 the entire record was transferred to the United States District Court for the District of Columbia pursuant to a transfer order from the Judicial Panel on Multi-District Litigation (MDL). After consolidated pretrial proceedings, the case was remanded to this Court on December 10, 1979 for further proceedings and trial.

The plaintiff Dale A. Hupp alleges he contracted multiple sclerosis (MS) as a direct result of a swine flu inoculation he received, and seeks damages from defendant United States for his injuries. Plaintiff Carolyn Hupp seeks damages for loss of consortium and service and for wages lost when she had to resign from her job and care for her husband.

In August of 1976, Congress enacted the Swine Flu Act, substituting the United States as the only party liable for damages resulting from an inoculation of swine flu vaccine. It further established the FTCA as the vehicle for asserting any claims against the government. A comprehensive history of the Swine Flu Act is reported in several cases and will not be repeated here. For a thorough analysis *see Hunt v. United States,* 636 F.2d 580 (D.C.Cir.1980). For the reasons set forth below we find that Dale Hupp has not proven by a preponderance of

the evidence that his MS was caused by the swine flu vaccine.

The following constitutes our findings and conclusions on the issue of causation.

BACKGROUND

Plaintiff Dale Hupp (hereinafter referred to as plaintiff) is a thirty-three year old resident of Newark, Ohio. He was twenty-seven years old when he received his swine flu shot on November 30, 1976. Plaintiff Carolyn Hupp is the former wife of the plaintiff Dale Hupp. Plaintiff had the usual childhood diseases of measles, chicken pox, and mumps and a history of an appendectomy and a knee operation. He is also known to have a congenital spina bifida of the lumbar spine which has, throughout his life, been non-symptomatic. Plaintiff has no history of neurological disease. Plaintiff's father and mother are both living and he has three brothers, all presently in good health. Plaintiff's younger brother has what has been diagnosed as a juvenile onset of diabetes. His mother has rheumatoid arthritis, but neither are substantially effected in normal activities by their respective diseases. Plaintiff's maternal uncle has been diagnosed as having had an attack of optic neuritis from which he appears to have fully recovered. There is no other history of neurological disease in the Hupp family.

On November 30, 1976, plaintiff was inoculated with the swine flu bivalent vaccine. On the evening of the vaccination plaintiff experienced some mild nausea which lasted approximately two days but which did not interfere with his daily routine and did not require medical treatment. Approximately four to seven days after the vaccination plaintiff began to experience a feeling of numbness and tingling in the area of his abdomen on the right side. This condition also did not interfere with his work or normal activities and did not require medical consultation or treatment.

In mid-December of 1976 plaintiff began to notice a sensation of "flashing" in the left eye which he characterized as "lightning going off." This condition was at first intermittent but progressed in frequency and duration. Plaintiff complained of this to his family physician and friend, Dr. John Winsch, who examined him several times before referring him to an ophthalmologist in February of 1977.

On February 28, 1977 plaintiff was examined by Dr. Leroy Bloomberg, an ophthalmologist located in Newark, Ohio. At the time of that examination, plaintiff's visual acuity in the left eye was perception of hand movement only and the condition of the left eye was diagnosed as optic neuritis. Plaintiff's left eye was treated by Dr. Bloomberg with injections of a steroid but this treatment did not arrest the condition. By mid-March of 1977 plaintiff had lost total vision in the left eye and such total loss continues to this date.

In mid-April of 1977 plaintiff began to experience the same sensation of flashing in his right eye and was admitted to Mt. Carmel Hospital in Columbus, Ohio on April 25, 1977. On April 28, 1977 plaintiff was transferred to Ohio State University Hospital in Columbus, Ohio, where he remained a patient until May 4, 1977. While at Ohio State University Hospital plaintiff received various laboratory tests and was treated with high doses of oral decadron which improved visual acuity in his right eye. The discharge diagnosis indicates that plaintiff suffered from an optic neuropathy o.u., acute o.d., and chronic o.s.

Plaintiff was re-admitted to Ohio State University Hospital on May 19, 1977 and a physical examination revealed visual acuity without correction, "count fingers at three feet in the right eye, and no light perception in the left eye." He was again treated with decadron and vision in the right eye improved upon discharge on May 24, 1977. Plaintiff's visual acuity in the right eye has not changed since the time of his discharge from Ohio State University Hospital. His present eye condition, therefore, is limited vision in the right eye and no vision in the left eye.

July 1, 1977 plaintiff was admitted to Licking Memorial Hospital in Newark, Ohio, under the care of Dr. John Winsch,

his personal physician. Dr. Winsch's admitting report indicated that plaintiff had begun to experience a feeling of numbness or slight tingling on the soles of his feet about four days prior to his admission. Dr. Winsch was concerned that these symptoms might possibly represent early sensory changes of multiple sclerosis and when the changes advanced to include the area from the knee down bilaterally, he felt that plaintiff should see Dr. Perrine, even though at the time there was no motor deficit and no deficit of pain and temperature. By the time of plaintiff's discharge on July 3, 1977 the paresthesias which had affected his feet had advanced completely to his waist. Some minimal loss of coordination in the lower extremities was noted. The final diagnosis was multiple sclerosis, rather rapidly progressive; and possible acute viral meningoencephalitis, suspected, not proven. It has since been determined that plaintiff suffered, and continues to suffer, from multiple sclerosis.

After discharge from Licking Memorial Hospital, plaintiff's physical condition rapidly deteriorated until he became totally bedfast in September of 1977. His condition since that time has never substantially improved, although there are periods of remission and exacerbation of his disease.

Plaintiff suffers from MS and optic neuritis. MS is a chronic degenerative disease of the central nervous system, characterized pathologically by multiple patch areas of demyelinization and sclerosis throughout the white matter of the central nervous system. Optic neuritis is a term used to describe inflammation, demyelinization or degeneration of the optic nerve. Plaintiff's optic neuritis is part of the disease process of MS which first manifested itself in December of 1976.

MEDICAL TESTIMONY

Prior to trial, the Court viewed a collage prepared by the government of video tape multi-district litigation medical testimony on the issue of causation. In addition, medical experts testified at trial either live or by deposition, and all of this evidence has been carefully considered by this Court.

We have also considered the medical literature, including the MDL documents submitted to the Court.

Plaintiff's medical expert, Dr. John Winsch, testified that in his opinion the swine flu shot received by Dale Hupp on November 30, 1976 was the proximate cause of plaintiff's MS and optic neuritis. Dr. Winsch's opinion is based upon a popular theory that MS is an auto-immune disease in which the body's immunological system becomes misdirected and attacks itself rather than some foreign substance introduced into the body. It is Dr. Winsch's theory that the foreign substance introduced into plaintiff's body (swine flu vaccine) triggered this abnormal immunological response and caused plaintiff's immunological system to destroy areas of the myelin sheath surrounding the central nervous system rather than produce antibodies to fight the foreign substance. Dr. Winsch believed this abnormal response occurred because plaintiff's immunological system was "set up" by some virus plaintiff may have had ten or twenty years ago. The effect of the virus thereafter remained dormant until triggered by the swine flu vaccine. Dr. Winsch was not able to identify what component of the swine flu vaccine triggered this response. Dr. Winsch admitted that this theory of causation has not been proven and admitted further that there has been no study indicating a causal relationship between the swine flu vaccination and the appearance of MS. Dr. Winsch was convinced, however, to a reasonable degree of medical certainty, that the swine flu vaccine caused plaintiff's MS based on the facts that no other antecedent event was identified that could have triggered the MS and the close temporal relationship between plaintiff's receipt of the shot and onset of MS.

Dr. Jerry Mendell testified as an expert witness for the government. Dr. Mendell agreed with Dr. Winsch that MS is an auto-immune disease and further agreed that the viral immune theory espoused by Dr. Winsch is the most commonly held theory of causation of MS. He stated, however,

that it remains an unproven theory only and that in his opinion plaintiff's MS was not caused by the swine flu vaccine.

Dr. Mendell testified that no one knows what causes MS or optic neuritis; both are diseases of the central nervous system, as contrasted with Guillan Barre Syndrome (GBS) which is a disease of the peripheral nervous system. The cause of GBS also is unknown. In both MS and GBS the body's immunological system attacks the myelin sheath surrounding the nerves. However, there are substantial differences between the myelin surrounding nerves of the peripheral nervous system and myelin surrounding nerves of the central nervous system. With MS, the disease process involves the formation of plaque and loss of myelin which is never regenerated. With GBS the disease attacks the myelin sheath but the myelin regenerates itself in most cases and the victims recover. Dr. Mendell testified that it is very rare for diseases of the central nervous system and peripheral nervous system to overlap and if a person did have diseases involving both systems, the diseases would not be related. Dr. Mendell testified further that although optic neuritis is associated with MS in about fifty percent of MS cases, optic neuritis is never associated with GBS.

Dr. Mendell based his conclusion that the swine flu vaccine received by plaintiff did not cause his MS primarily on two factors. The first was that the epidemiological study conducted by the Center for Disease Control (CDC) subsequent to the swine flu immunization program, indicated no significant statistical increase in the occurrence of MS in the general population following receipt of the swine flu shot. In contrast, the CDC study showed a significant statistical increase in the incidence of GBS in the population following receipt of the swine flu shot. Dr. Mendell stated that epidemiological studies are important to doctors with regard to diseases such as MS where the cause is unknown; they help doctors understand the risk factors associated with certain diseases and help identify cause and effect relationships. It was Dr. Mendell's opinion that any causal relationship between the swine flu shot and MS would have shown itself with so large a sample size (forty-eight million persons inoculated) as did the relationship between the shot and GBS. Absent such a showing and absent any known cause of MS, it was Dr. Mendell's opinion that it could not be concluded, to a reasonable degree of medical certainty, that plaintiff's MS was caused by the swine flu shot.

The second basis for Dr. Mendell's opinion was that studies of MS patients who were given swine flu shots showed no exacerbation of their MS symptoms. These patients were able to build an immune response and were found to be making antibodies to the vaccine, but not developing any new symptoms of MS. It was Dr. Mendell's opinion that people with a predisposition to MS would have an exacerbation of symptoms if there was anything in the vaccine that caused MS.

Dr. Mendell testified further that plaintiff was susceptible to MS for a number of reasons: there was evidence of similar neurological problems in the family (uncle had optic neuritis); plaintiff lives in a temperate zone (about 60 cases per 100,000 of population per year in this area; and plaintiff's age (MS primarily affects young adults).

DISCUSSION

This Court is particularly troubled by this case, but, based on this record, we find that plaintiffs have failed to meet their burden of proof, based on a reasonable medical certainty that the MS suffered by Dale Hupp was caused by the swine flu shot he received on November 26, 1976.

In favor of plaintiff's position is the extremely short period of time that elapsed between his receipt of the swine flu shot and the onset of symptoms of plaintiff's MS. Although there was some question in Dr. Winsch's mind whether plaintiff had first complained of his symptoms in mid-December or late February, this Court is impressed with the testimony of plaintiff and all of the family members that plaintiff first began to experience flashing in his eye

sometime around Christmas of 1976, three to four weeks after receipt of the swine flu shot. We think it is more likely either that plaintiff did not complain to Dr. Winsch right away or that Dr. Winsch was mistaken in his belief that he sent plaintiff to Dr. Bloomberg immediately upon learning of the flashing in plaintiff's eye. Dr. Winsch himself originally thought that plaintiff first complained about his eye sometime in December and conceded it might have been February of 1977 only because he was sure that he had sent plaintiff to see Dr. Bloomberg right away. We have examined the inconsistencies in the testimony and find that plaintiff has proved by the more credible evidence that his symptoms of MS began to appear sometime in December of 1976.

In addition to the close temporal relationship, plaintiff's case is supported by the fact that there have been studies which indicate that some vaccinations may cause MS, or that MS followed such vaccinations; that it was predicted that there could be neurological difficulties resulting from the swine flu vaccination and MS is a neurological disorder; and that it is postulated that MS is an auto-immune process similar to GBS whereby demyelinization of the nerve sheath occurs, caused by an attack on the myelin by antibodies. A strong argument is made therefore, that since MS is an auto-immune disease of the central nervous system involving demyelinization which is similar to the auto-immune process involved in GBS which also is a demyelinization process, and since the government accepts liability where a strong temporal relationship exists between a swine flu shot and GBS, it should also do so where there is a strong temporal relationship between the swine flu shot and the acute onset of MS.

In addition, this Court was extremely impressed with the sincerity of Dr. Winsch, plaintiff's treating physician and expert witness. Dr. Winsch obviously thoroughly studied the various theories relating to the cause of MS and carefully explained to the Court the basis for his opinion. His opinion, however, is not entirely persuasive for a number of reasons. First, Dr. Winsch is a family practitioner with no experience or knowledge relating to the fields of neurology or immunology except for his studies while in medical school. Moreover, as compelling as plaintiff's theory is, it remains an unproven theory only and those physicians with more experience than Dr. Winsch in the relevant fields have not been able to conclude as he has, that the swine flu shot caused MS in any person. To this day, no one knows the cause of either MS or GBS and while the auto-immune theory which postulates that antibodies attack the myelin sheath of the nerves is probably accepted scientifically for both GBS and MS, the reason why the antibodies are triggered to do so is sheer speculation. There is, therefore, very little medical literature to support Dr. Winsch's opinion and the studies that are available cast some doubt on the viability of plaintiff's theory.

We find it significant that forty-eight million Americans were vaccinated and that no increase in the incidence of MS in the general population was noted despite the careful study conducted by the CDC. With so many people vaccinated, and with a normal rate of 60 per 100,000 persons in this area contracting MS per year, it is logical that some of the persons who received the shot also would contract MS, even though the two events are unrelated.

Moreover, we are persuaded by the testimony of Dr. Mendell that if there was a cause and effect relationship between the shot and the MS, there would have been some increase in the symptoms of MS in MS patients given the swine flu vaccine.

The government accepted liability in certain cases of GBS only because of the noticeable increase in the incidence of GBS in the population following the swine flu program. The fact that plaintiff's symptoms of MS manifested themselves soon after the shot, without more, is not sufficient to establish causation. MS is a neurological disease as is GBS, but that is the only similarity between the two diseases. In all other aspects they are significantly different and we agree with Dr. Mendell that just be-

cause the shot may have caused GBS in some persons, it does not necessarily follow that it also would have caused MS.

With regard to the testimony of Dr. Mendell in general, we found it to be more credible than that of Dr. Winsch, based on Dr. Mendell's expertise and knowledge in the field of neurology. It is not necessary to recite his qualifications here, except to note that they are most impressive. It is true that Dr. Mendell never examined the plaintiff and even though it might have been helpful had he done so, it is not a critical omission and we found Dr. Mendell's testimony to be extremely helpful to this Court at arriving at our decision today.

## CONCLUSIONS OF LAW

This Court has jurisdiction over this action pursuant to the National Influenza Immunization Act of 1976, 42 U.S.C. § 247b, and the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*

The case is tried by the Court sitting without a jury, pursuant to 28 U.S.C. § 2402.

 Plaintiff has the burden of proving by a preponderance of the evidence that the swine flu shot he received on November 26, 1976 was the cause or a substantial cause of his MS in December of 1976. Ohio law provides that proof of proximate cause consists of proof that the original act produces a result which would not have otherwise taken place and does so in a natural continuous sequence. *Strother v. Hutchinson,* 67 Ohio St.2d 282, 286–87, 423 N.E.2d 467 (1981).

■ This Court concludes that on the basis of the record before the Court, plaintiff Dale Hupp did not meet his burden of proving that the swine flu vaccine caused or substantially contributed to his MS beginning in December of 1976. In so concluding the Court is cognizant of the volumes of authority holding that a temporal relationship by itself is not sufficient to establish causation. Moreover, in no case in which a decision has been rendered to date on this question, has a court concluded that either optic neuritis or MS was caused by the swine flu vaccine even where there was a close temporal relationship. *See Kirby v. United States,* No. 79–1805 (D.D.C., July 16, 1982); *Healy v. United States,* 552 F.Supp. 505 (E.D.N.Y.1982); *Grill v. United States,* 552 F.Supp. 505 (E.D.N.Y.1982); *Cikins v. United States,* No. 78–328–A (E.D.Va., June 16, 1980).

Because plaintiff failed to prove that he contracted MS as the proximate result of the swine flu vaccine he received on November 26, 1976, this action should be and is hereby dismissed. Because the claim of plaintiff Carolyn Hupp is derived from that of Dale Hupp, her claim should also be and is hereby dismissed.

SO ORDERED.